UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

DEDRIC J. LLOYD,           )
                            )
     *Plaintiff*,       )
                            )     Civ. No. 1:12-cv-354
v.                        )
                            )     *Collier / Lee*
COMMISSIONER OF SOCIAL SECURITY,  )
                            )
     *Defendant*.     )

## REPORT AND RECOMMENDATION

Dedric J. Lloyd brought this action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying him supplemental security income ("SSI") and disability insurance benefits ("DIB"). The Commissioner has filed a motion for summary judgment [Doc. 13].

For the reasons stated below, I **RECOMMEND** (1) the Commissioner's motion for summary judgment [Doc. 13] be **GRANTED** and (2) the decision of the Commissioner be **AFFIRMED**.

## I.    ADMINISTRATIVE PROCEEDINGS

Plaintiff initially filed his application for SSI and DIB on October 25, 2006, alleging disability as of September 15, 2006 (Transcript ("Tr.") 184-93). Plaintiff's claims were denied initially and upon reconsideration and he requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 82-85, 106-20). The ALJ first held a hearing on May 6, 2008, during which Plaintiff was represented by an attorney (Tr. 62-81). The ALJ issued his decision on January 23,

2009 and determined Plaintiff was not disabled because there were jobs he could perform in the national economy (Tr. 86-99). Upon review by the Appeals Council, Plaintiff's claims were remanded to the ALJ for further consideration (Tr. 100-05). The ALJ held a second hearing on April 19, 2011, during which Plaintiff was again represented by an attorney (Tr. 41-61). The ALJ issued another decision on April 26, 2011 and again determined Plaintiff was not disabled because there were jobs he could perform in the national economy (Tr. 11-35). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-7). Plaintiff filed his complaint *pro se* on October 26, 2012 and timely sought judicial review of the Commissioner's final decision [Doc. 1].

## II.     FACTUAL BACKGROUND

### A.     2008 Hearing

Plaintiff was 29 at the time of the first hearing before the ALJ and had completed the eleventh grade in school (Tr. 65, 216). Plaintiff had not been able to return to work after his onset date, had no income, and relied on family support (Tr. 66). Plaintiff testified that he had multiple sclerosis ("MS") and experienced numbness in his hands and feet, which caused problems with gripping objects and standing; he thought he could probably only stand or walk for two hours in an eight hour day (Tr. 66-67). If he did so, he would get stiff, experience vertigo and could possibly fall (Tr. 67). Plaintiff testified he would eventually experience vertigo if he stood in a stationary position for about 15 to 20 minutes, and he also experienced vertigo when walking (Tr. 67-68). Plaintiff testified to dizziness while sitting as well, and that had previously resulted in a seizure (Tr. 70). Plaintiff testified to having surgery on his right hand after hitting it on something and he experienced numbness in one part of his hand at all times (Tr. 68-69). The numbness in his left hand came and went (Tr. 69). Plaintiff stated he had

previously cut his hand because of his problems with gripping objects and dizziness (Tr. 69-70). Plaintiff thought he could handle light objects, but might have problems with fingering and grasping small objects (Tr. 70-71). Plaintiff stated he could not lift or carry over 15 or 20 pounds (Tr. 71).

Plaintiff testified he had a driver's license, but had not driven since his seizure (Tr. 71). Plaintiff had only had one seizure since his onset date, but testified his doctor told him he was having smaller seizures when he was dizzy (Tr. 73). Plaintiff further testified to having problems with headaches and had a headache about every two or three days; they were better than before, when he got them daily, but too much activity could still bring one on (Tr. 74). Plaintiff had tried to return to work unsuccessfully after his onset date, but had not been able to feel his hands (Tr. 75).

The ALJ sought testimony of vocational expert ("VE") Dr. Benjamin Johnston during the hearing. The ALJ asked the VE to assume an individual who was 27 to 29 with Plaintiff's work history and education, who could lift 10 to 15 pounds frequently; stand and walk for one to two hours and/or sit for six to eight hours in a day; had an adequate ability to use his upper extremities for pushing, pulling, reaching, handling, fingering, and feeling; could not climb or crawl; could only sometimes balance, stoop, kneel or crouch; could see and had an adequate ability to hear and speak; could not be exposed to extreme temperatures or hazardous machinery; could not drive commercially; and had an adequate ability to work within a schedule, maintain attendance, be punctual, interact appropriately with others, use judgment, and adapt to changes (Tr. 77-78). The VE testified such an individual could work as an inspector, a packer, or an unarmed security guard, with about 250 to 300 of each job regionally and 150,000 nationally (Tr. 78). The ALJ next asked the VE to assume the same individual, but to also assume he would

experience numbness in the hands that might affect fingering or holding objects; the VE testified that this additional restriction would eliminate approximately half of the jobs identified previously (Tr. 79). The ALJ finally asked the VE if any jobs would be available if Plaintiff's testimony was credited such that symptoms of MS and vertigo would cause a significant limitation in his ability to perform activities within a schedule, maintain regular attendance, and be punctual, and the individual would be able to sit, stand and walk for less than eight hours in a day (Tr. 79). The VE testified no jobs would be available for such an individual (Tr. 79-80). At the end of the hearing, the ALJ indicated Plaintiff would be scheduled for a neuropsychological evaluation (Tr. 80).

### B. 2011 Hearing

Following remand by the Appeals Council, the ALJ held a second hearing on April 19, 2011 (Tr. 41-61). The ALJ noted Plaintiff had not attended the psychological evaluation scheduled for him and had waived his right to attend that evaluation (Tr. 43). Plaintiff was 31 years old at the date of this hearing and had attempted unsuccessfully to work for brief periods of time after the first hearing (Tr. 44, 46-47). Plaintiff testified he was still being treated for MS and was still having problems standing and walking for extended periods of time; he also got tired and stiff after sitting (Tr. 48). Plaintiff still experienced dizziness and was dizzy while sitting at times; he also testified he was having daily headaches that came and went throughout the day (Tr. 49). Plaintiff experienced chronic muscle weakness in his hands and legs (Tr. 49). Plaintiff testified his seizure medication helped, and his doctor said he needed to rest and not over extend himself to prevent seizures; he had not had a seizure while on the medication, but the medication made him very tired and he had to take three naps a day (Tr. 50-51). Plaintiff received injections for MS, which also caused fatigue and flu-like symptoms such as chills and

congestion (Tr. 51). Plaintiff testified he did not think he could perform a simple, sit down job because the dizziness sometimes made it hard to concentrate and he might do the wrong thing (Tr. 52). Plaintiff stated he still experienced chronic muscle weakness in his hands and legs and had some chronic pain in his back, but he did not treat it with any other medication (Tr. 52-53). Plaintiff had a friend help him with personal care needs such as getting in the shower and making meals; Plaintiff relied on friends for rides; and he thought he would need help managing his finances if he had money (Tr. 53-54).

The ALJ sought the testimony of VE Dr. Richard Hark during this hearing. The ALJ first asked the VE to assume an individual 31 years of age with a limited eleventh grade education and Plaintiff's work history, who could lift and carry 10 pounds continually and up to 20 pounds occasionally; sit for one hour at a time and for four to six hours total; stand for one hour at a time for two to four hours total; walk for one hour at a time for two to four hours total; he could perform fine and gross manipulation frequently; occasionally balance, stoop, kneel, crouch and crawl, but never climb, be around exposed heights or hazardous machinery, or drive commercially; and had adequate abilities in the following: seeing, hearing, speaking; understanding, remembering and carrying out simple, one and two step tasks; interacting appropriately with coworkers, supervisors and the public; using judgment in performing unskilled or low semi-skilled work; and dealing with ordinary changes in the work setting (Tr. 56). In addition, although the individual was somewhat limited by chronic pain, there would still be an adequate ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances (Tr. 56). The VE testified that this individual could perform light work jobs with a sit/stand option or jobs which involved ample opportunity to sit down; examples identified were ticket seller at a facility such as a parking garage, with 4,500 of

these jobs available in the area and 700,000 nationally; a vending machine attendant in a break room, with 1,200 jobs regionally and 150,000 nationally; or a ticketer in the textile or carpet industry, with 1,200 jobs in the area and over 30,000 in the nation (Tr. 57). The VE testified that the ability to sit for an hour at a time without interruption would be consistent with the sit/stand option available in those jobs (Tr. 59). The ALJ further asked if there were unskilled, sedentary jobs that would fit the hypothetical individual, and the VE testified the individual could work as a weight tester in the paper and pulp industry, with over 600 jobs in the region and 5,000 nationally; a weave defect charting clerk, with over 700 jobs regionally and over 5,000 in the nation; or a surveillance system monitor, with over 3,000 jobs regionally and 900,000 nationally (Tr. 59). The VE reviewed the opinions of Dr. Cornelius Mance and Dr. Emelito Pinga and stated the restrictions therein appeared to mirror the ALJ's first hypothetical question and did not include any additional restrictions not included in the hypothetical (Tr. 58-59). The ALJ next asked the VE if there would be jobs available if he credited Plaintiff's testimony that he required three naps a day and the individual had to take unscheduled breaks from work to rest outside of normal breaks; the VE testified this would preclude all work at all exertional levels (Tr. 58). Finally, the ALJ asked the VE if jobs would be available if the individual experienced chronic weakness and fatigue attributable to MS such that he could not sit, stand or walk for eight hours in an eight hour day (Tr. 60). The VE testified that this individual would not be able to perform any range of full time work (Tr. 60).

### C.     Medical Records

On October 9, 2006, Plaintiff reported to the Erlanger ER complaining of dizziness, headaches, pain and weakness (Tr. 306). Plaintiff reported he had blacked out and had a car accident two months prior (Tr. 306). Prior to the accident, Plaintiff had mild headaches with

photophobia, phonophobia, and olfactory hallucinations; Plaintiff also had occasional jerking movements of all four extremities associated with headaches and hallucinations and all of these symptoms had increased in the last two days (Tr. 306). A CT scan showed no acute intracranial process but an area was noted in the left periventricular white matter (Tr. 313, 321-22). Plaintiff was admitted to the hospital in the early hours of October 10, 2006 and the attending physician noted the headaches could be from migraines, cluster headaches or intracranial lesions and the dizziness could be a result of the headaches, exhaustion, dehydration, cardiac or central nervous system causes (Tr. 301-03). An MRI of Plaintiff's brain on October 10 showed there were multiple small foci of abnormal, non-enhancing T2 hyperintense signal in the periventricular white matter of both deep frontal lobes; it was noted that the differential diagnosis "may include multiple sclerosis, encephalitis, arteritis/vasculitis" (Tr. 314, 343). Neurologist Dr. Cornelius Mance reviewed the MRI and noted the abnormality (Tr. 304-05). An electroencephalographic test on October 11, 2006 was normal with no epileptic activity or focal abnormalities (Tr. 315, 376). A lumbar puncture was performed on Plaintiff on October 12, 2006 (Tr. 312).

On October 23, 2006, Plaintiff presented to Northgate Neurology for a follow up visit with Dr. Mance (Tr. 317, 470). Dr. Mance noted Plaintiff's MRI was abnormal and consistent with demyelinating disease and spinal fluid analysis revealed increased gamma globulins and oligoclonal bands (Tr. 317, 470). Plaintiff recounted his symptoms to Dr. Mance stating that he had some trouble with vision in his left eye and some tingling in his hands (Tr. 317, 470). A neurological exam of Plaintiff showed mostly normal results (Tr. 317, 470). Dr. Mance observed Plaintiff could stand and walk without any problems, his hearing was good, and he was able to hop, squat, and jump without difficulty (Tr. 317, 470). Dr. Mance noted that Plaintiff's mental

state was good and observed the clinical and physical exams were consistent with MS and Plaintiff needed immunotherapy (Tr. 317-18, 470).

Plaintiff reported to Erlanger on November 3, 2006 for a follow up visit with Dr. Ann Rybolt (Tr. 342-43). Plaintiff's only complaint was some numbness in his right middle finger as well as the medial aspect of his right lower extremity; he was not experiencing gross weakness, worsening headaches or fainting (Tr. 342). It was noted that Plaintiff's cerebral spinal fluid results showed increased white blood cells and lymphocyte predominance and Plaintiff had oligoclonal bands (Tr. 343). Dr. Rybolt noted, per neurology, that Plaintiff would be started on immunotherapy (Tr. 343). Plaintiff had a follow up appointment with Dr. Mance on November 20, 2006 (Tr. 469). Dr. Mance noted Plaintiff's diagnosis of MS and observed Plaintiff's physical examination was normal (Tr. 469). Plaintiff continued to have headaches, he should start immunotherapy, and he could return to his regular activities but recognize he would have good and bad days (Tr. 469).

Plaintiff reported to Erlanger on November 26, 2006 for right hand pain due to a fall (Tr. 357, 360-65, 371-75, 405-06). Dr. Julian Price examined Plaintiff early on November 27, 2006 and noted there was moderate swelling of the dorsum of the hand and wrist and palpable crepitus and instability at the base of the fourth metacarpal (Tr. 357, 381-84). Three x-ray views of Plaintiff's hand confirmed the dislocation of the fourth metacarpal with associated hamate body fracture (Tr. 357, 379, 382). Plaintiff was placed under conscious sedation and a C-arm fluoroscopy closed reduction was performed; afterward Dr. Price noted there was adequate reduction of the fourth metacarpal base, but there was still a hamate fracture present (Tr. 357). Dr. Price discharged Plaintiff to follow up later that week at the hand clinic to schedule surgery for likely closed reduction and percutaneous pinning, and instructed Plaintiff in his discharge

8

papers to return to work or school in three to five days (Tr. 357, 371). Plaintiff returned to Erlanger on November 29, 2006 and had x-rays taken again, which showed a right hamate fracture with fourth and fifth metacarpal dislocations (Tr. 333-36). Surgery was scheduled for the following week (Tr. 333-36).

Plaintiff reported to Erlanger on December 1, 2006 for a follow up visit (Tr. 340-41). Plaintiff reported being laid off from his job due to the episodes of dizziness and imbalance as his main job was to drive a fork lift (Tr. 340). Plaintiff continued to have paresthesias in his bilateral finger tips, intermittent right lower extremity pain, and vertigo (Tr. 340). It was noted that Plaintiff was attempting to get approved for patient assistance programs for his medications (Tr. 341). Plaintiff was given literature on MS and was also given a sample of meclizine for his symptoms of dizziness and vertigo (Tr. 341).

Dr. Marvin Cohn filled out a physical residual functional capacity ("PRFC") assessment on December 5, 2006 and opined Plaintiff could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to 10 pounds, stand and/or walk for about six hours in an eight hour work day, sit for about six hours in an eight hour work day, and was unlimited in his ability to push and/or pull (Tr. 345). Plaintiff could frequently stoop, kneel, crouch, crawl; Plaintiff could occasionally climb a ramp or stairs and could occasionally balance, but could never climb a ladder, rope, or scaffold (Tr. 346). Dr. Cohn opined Plaintiff was unlimited in his ability to work in extreme environmental conditions, but should avoid concentrated exposure to extreme heat and hazards (Tr. 348). Dr. Cohn suggested Plaintiff could perform light work with these restrictions (Tr. 351).

Plaintiff had surgery on his right hand on December 7, 2006 (Tr. 352-56, 385, 389-90). Dr. Alex Davit and Michael Lawley performed the surgery which consisted of a closed reduction

and percutaneous pinning of the right base of fourth and fifth metacarpal fractures and a closed reduction and percutaneous pinning of the right hamate dorsal fracture (Tr. 354-56). After the surgery, Plaintiff was instructed to keep his right arm and hand elevated (Tr. 356). On December 13, 2006, Plaintiff reported to Erlanger for his follow up appointment and was examined by Dr. Lawley (Tr. 337, 386). Plaintiff did not complain of pain (Tr. 337). Dr. Lawley noted on examination and from x-ray views that the pin sites were intact with no evidence of drainage, loosening or failure and the fractures continued to be well reduced (Tr. 337). Dr. Lawley ordered a follow up in three weeks to remove the pins and Plaintiff's hand was immobilized (Tr. 337). Plaintiff reported to the Erlanger ER on December 25, 2006 after cutting his upper arm with a knife while opening a Christmas present (Tr. 367-70, 436-41). Plaintiff returned on January 1, 2007 for a follow up visit on his broken hand, during which Plaintiff was doing well with no complaints of pain or swelling and no evidence of infections at the pin site; however, the pins were to be left in for a couple more weeks (Tr. 339). X-rays on January 3, 2007 showed that the right wrist appeared to be stable, but there was only minimal healing of the hamate fracture (Tr. 378).

On February 20, 2007, Plaintiff had a follow up visit with Dr. Mance, who noted Plaintiff's MS was stable, his physical examination was normal, and his left eye vision was improved (Tr. 468). Dr. Mance wrote a letter on March 1, 2007 in which he stated Plaintiff was able to drive without any difficulty (Tr. 472). Plaintiff reported to Erlanger on March 7, 2007 for a follow up visit and complained of some paresthesias in his bilateral finger, occasional sharp pains in his bilateral fingertips, and occasional vertigo but no fainting (Tr. 407-08). Plaintiff had occasional dizziness but said he was able to return to work without incident (Tr. 407).

10

Dr. James Moore filled out a PRFC assessment on March 20, 2007 and opined Plaintiff could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to 10 pounds, stand and/or walk for about six hours in an eight hour work day, sit for about six hours in an eight hour work day, and was unlimited in his ability to push and/or pull (Tr. 394). Plaintiff could frequently stoop, kneel, crouch, crawl; Plaintiff could occasionally climb a ramp or stairs and occasionally balance, but could never climb a ladder, rope, or scaffold (Tr. 395). Dr. Moore noted Plaintiff was visually limited in far acuity (Tr. 396). Dr. Moore opined Plaintiff was unlimited in his ability to work in most environmental conditions, but should avoid concentrated exposure to extreme heat and hazards (Tr. 397). Dr. Moore further opined Plaintiff's diagnosis of MS was not definitively confirmed and follow up exams showed normal results; Plaintiff's right hand was healing well; and Dr. Moore had considered pain, weakness, fatigue and dizziness and incorporated those considerations in his opinion (Tr. 400).

Plaintiff reported to Erlanger on March 31, 2007 following a tonic-clonic seizure observed by family members (Tr. 416-17, 421-24). Dr. Robert Magill noted Plaintiff did not have a history of seizure, illicit substance use, or head trauma and his assessment was seizure, hypokalemia, and a history of MS (Tr. 416-17). Dr. Magill opined Plaintiff should have a neurology evaluation, MRI, and an EEG (Tr. 417). Plaintiff had the MRI and EEG on April 1, 2007, along with an ECT (Tr. 425-29, 431-33). Plaintiff's EEG was normal; Plaintiff's MRI was showed moderate nonspecific subcortical and periventricular white matter changes, consistent with gliosis from a chronic inflammatory demyelinating process and it also revealed a single focus of enhancing, active inflammation in the left occipital lobe (Tr. 425-27, 431-32). Plaintiff's ECT revealed a small, non-specific hypodense focus in the right corona radiate/centrum semiovale (Tr. 428). A scan of Plaintiff's chest was normal (Tr. 430). Plaintiff

was told not to drive or operate machinery for six months and to follow up with Dr. Mance and his primary care physician (Tr. 418-19).

On May 9, 2007, Plaintiff reported to Erlanger for a follow up visit and it was noted Plaintiff had a seizure in April (Tr. 409-10). Plaintiff reported no other seizures since discharge, but had had episodes of vertigo; Plaintiff would remain on medication for dizziness, seizures and MS (Tr. 409). On May 15, 2007, Plaintiff had a follow up visit with Dr. Mance, who noted Plaintiff's MS was stable, his seizures were under control, and his last seizure was in April so he was eligible to drive six months after that (Tr. 467). Dr. Mance noted Plaintiff experienced blurred vision in his right eye, but he was able to walk, stand, hop and squat and was doing well mentally (Tr. 467). On September 21, 2007, Plaintiff saw Dr. Mukta Panda for a follow up visit and reported no seizures and no symptoms (Tr. 411). Dr. Panda advised Plaintiff not to drive for at least six months until he was seizure free and to follow up with Dr. Mance in October (Tr. 411).

On January 18, 2008, Plaintiff reported to Dr. Michael Humble for a follow up visit and Plaintiff reported no recent seizures and no further complaints; Dr. Humble opined Plaintiff still should not drive (Tr. 413-14). Plaintiff returned for a follow up visit concerning his seizure disorder on April 9, 2008 and Dr. Humble noted Plaintiff had no seizure symptoms since his questionable tonic-clonic seizure (Tr. 485, 496-97). Dr. Humble noted Plaintiff's liver enzymes were elevated and ordered a repeat test along with a hepatitis B antibody and hepatitis C antibody (Tr. 497). Dr. Humble noted Plaintiff's MS appeared well controlled and Plaintiff had no new symptoms; Plaintiff reported his vertigo had dissipated significantly and he was not taking medication for it regularly (Tr. 496). Dr. Humble discontinued Plaintiff's seizure medication (Tr. 497).

Plaintiff established as a new patient with Dr. Naushaba Rizvi on June 10, 2008 and sought a referral to a neurologist; a scan of his chest the same day was normal (Tr. 507-08, 511). Plaintiff followed up with Dr. Rizvi on June 25, 2008 to get disability paperwork filled out (Tr. 505-06). Dr. Rizvi completed the paperwork and opined Plaintiff could not be reasonably expected to be reliable in attending work eight hours a day, 40 hours a week, week after week, without missing more than two days per month (Tr. 443). Dr. Rizvi opined Plaintiff could sit less than an hour out of an eight hour work day, stand less than an hour out of an eight hour work day, and walk less than one half hour out of an eight work day (Tr. 443). Dr. Rizvi opined Plaintiff could frequently lift and/or carry one to five pounds, occasionally lift and/or carry six to ten pounds, and never lift and/or carry more than ten pounds (Tr. 443). Dr. Rizvi opined Plaintiff could occasionally bend and use right and left hands for fine manipulation, but Plaintiff could never stoop, squat, kneel, climb stairs, crawl, reach above shoulders, or walk on uneven surfaces (Tr. 444). Dr. Rizvi opined Plaintiff required thirty minutes to an hour of daily bed rest and had problems with stamina and endurance which would interfere with daily activities in the work environment, but was not on any medication that would affect his alertness or concentration (Tr. 444). Dr. Rizvi opined Plaintiff should not be around any environmental irritants and Plaintiff's condition would cause moderate pain in his hands and leg off and on daily (Tr. 444-45). Dr. Rizvi noted Plaintiff would experience frequent attacks of balance disturbance, extreme fatigue, sleeplessness, confusion, malaise, dizziness, anxiety, and headaches (Tr. 445). Dr. Rizvi opined Plaintiff could not work at all and Plaintiff's restrictions would last for at least twelve months (Tr. 446).

Plaintiff was referred to Dr. Abdul Eletr for his neurology needs and established with Dr. Eletr on July 12, 2008, at which time Plaintiff reported his diagnosis of MS, occasional vertigo

with certain head movements, headaches, and numbness in the feet and hands with varying intensity (Tr. 530). Plaintiff reported one previous seizure and had had no seizures even while off medication, and he was not experiencing any weakness or fatigue (Tr. 530). Plaintiff's examination was mostly normal, but showed decreased sensation in the feet to pinprick and Dr. Eletr noted possible peripheral neuropathy (Tr. 530). Dr. Eletr ordered a new MRI of the brain and an EMG to test for neuropathy (Tr. 530).

On August 15, 2008, Plaintiff was referred to Dr. Mance for a neurological examination (Tr. 287-89). Dr. Mance noted Plaintiff could not give a good recollection of his medical history, but that he had treated Plaintiff in 2006 and diagnosed him with MS (Tr. 287). Dr. Mance noted Plaintiff had had one seizure and his disorder was controlled with medication (Tr. 287, 289). Dr. Mance observed that Plaintiff still complained of arm, leg, and hand pain; he had difficulty answering questions; and he appeared to be having some cognitive dysfunction (Tr. 288). Dr. Mance noted Plaintiff could stand and walk on his heels and toes, but he was a little unsteady (Tr. 288). Dr. Mance's assessment was MS with cognitive dysfunction, easy fatigability, and seizure disorder controlled with medication (Tr. 288).

Dr. Mance filled out a check-box form on August 18, 2008 and opined Plaintiff could continuously lift and/or carry up to 10 pounds and occasionally lift and/or carry up to 20 pounds, but Plaintiff could never carry over 20 pounds (Tr. 448). Dr. Mance opined Plaintiff could sit for four hours at a time for four hours total, stand for one hour at a time for two hours total, and walk for one hour at a time for two hours total (Tr. 449). Dr. Mance opined Plaintiff could frequently perform all activities with his right and left hand and occasionally operate foot controls (Tr. 450). Dr. Mance noted Plaintiff could never climb ladders or scaffolds or balance, but could occasionally perform all other postural activities (Tr. 451). Dr. Mance opined Plaintiff could

never be around unprotected heights, moving mechanical parts, or extreme heat; Plaintiff could occasionally operate a motor vehicle and be exposed to extreme cold; and Plaintiff could frequently be exposed to other environmental irritants (Tr. 452). Dr. Mance noted Plaintiff could tolerate moderate noise (Tr. 452). Dr. Mance further noted Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces due to fatigue and an unsteady gait, but was otherwise able to perform basic physical and personal care activities (Tr. 453). Dr. Mance opined these limitations would last for at least twelve months (Tr. 453).

On August 19, 2008, Plaintiff reported to Erlanger for a follow up visit due to abnormal liver function tests (Tr. 484, 494-95). Plaintiff had no complaints other than some mild frequent urination (Tr. 494). Dr. Humble noted Plaintiff's MS appeared to be in remission and Plaintiff had missed his original follow up appointment for his abnormal liver enzymes, so they would do the test that day (Tr. 495). Dr. Humble further noted Plaintiff had had no seizure activity and his one seizure was questionable, so Plaintiff would remain off the medication (Tr. 495). On October 2, 2008, Plaintiff reported to Erlanger and again complained of frequent urination (Tr. 483, 492-93). Dr. Arshdeep Tindni noted that Plaintiff would be treated for a urinary tract infection with antibiotics and opined Plaintiff's bladder problems could be a result of his MS, which could cause decreased bladder function (Tr. 492). Plaintiff followed up with Dr. Humble on March 31, 2009 and again complained of urinary frequency; he stated he had had a seizure on February 14 and had been started on Dilantin again (Tr. 482, 489-90). Dr. Humble noted Plaintiff did not seem to have an infection, but Plaintiff had failed to report back for his follow up visit after the liver enzyme tests in August and they would be checked that day (Tr. 490).

On April 1, 2009, Plaintiff returned to Dr. Eletr and reported a seizure witnessed by his wife on February 14, 2009 (Tr. 529). Plaintiff had no new symptoms from MS and Dr. Eletr

15

noted Plaintiff had a history of seizures and had had a breakthrough seizure while on epileptic drugs (Tr. 529). Dr. Eletr changed Plaintiff's seizure medication and ordered a new brain MRI to look for interval changes in Plaintiff's MS (Tr. 529). An MRI on April 9, 2009 revealed findings consistent with Plaintiff's history of MS, but no evidence of enhancement to suggest active demyelinating process (Tr. 536). Plaintiff reported to Erlanger for a follow up visit on June 12, 2009 and again complained of urinary frequency (Tr. 481, 486-88). Dr. Humble noted it could be related to some neurogenic source due to his MS, but the etiology was unclear and Plaintiff was referred to a urologist (Tr. 487). He noted Plaintiff could not afford the new seizure medication and was back on Dilantin and tolerating it well; his MS was stable; and he had no episodes besides fatigue at the end of the day (Tr. 486). On August 20, 2009, Plaintiff returned to Dr. Eletr, who noted Plaintiff's last seizure was in February of 2009 and Plaintiff could drive as long as he was seizure free (Tr. 528). Dr. Eletr reviewed Plaintiff's MRI and noted Plaintiff was having no side effects from MS (Tr. 528). During Plaintiff's December 15, 2009 appointment with Dr. Eletr, Plaintiff had had no seizures since April 2009 and no current MS symptoms, although he was having tingling in his legs, which Dr. Eletr noted could be secondary to MS (Tr. 527). Plaintiff did not want medication for the tingling, and Dr. Eletr noted Plaintiff's seizure disorder was under control (Tr. 527).

At his next appointment with Dr. Eletr on April 15, 2010, Plaintiff reported having a seizure in February after not taking his medication (Tr. 526). On examination, Plaintiff had normal sensation to pinprick and touch in his extremities (Tr. 526). Dr. Eletr noted Plaintiff had not shown up for an MRI of his brain and cervical spine and he was encouraged to have those tests done (Tr. 526). The MRI of Plaintiff's brain on April 22, 2010 showed a stable appearance of the MS plaque noted on Plaintiff's previous MRI, which no abnormal enhancement (Tr. 532).

The MRI of Plaintiff's cervical spine showed nonenhancing MS plaques throughout the cervical cord and upper thoracic cord and minimal disc bulges (Tr. 533). Plaintiff returned on January 7, 2011 and Dr. Eletr noted Plaintiff's MS and seizure disorder were currently stable after reviewing Plaintiff's recent MRIs and because Plaintiff had been seizure free for nearly a year (Tr. 525). Plaintiff reported no new symptoms (Tr. 525). On January 26, 2011, Plaintiff reported to Dr. Rizvi complaining of right hand pain and swelling after he hit it when working out and lifting weights (Tr. 500-02, 509-10). An x-ray of Plaintiff's right hand revealed an acute fracture of the distal fifth metacarpal and possible fracture of the proximal end of the fourth metacarpal (Tr. 509). An x-ray of Plaintiff's left hand was normal (Tr. 510).

Plaintiff submitted to a physical examination by Dr. Emelito Pinga on March 7, 2011 (Tr. 275-78). Plaintiff reported that he been diagnosed with MS and grand-mal seizure disorder (Tr. 275). Most of the tests performed at the examination were normal; however, the neurological examination showed a slight decrease in sensation to pinprick and light touch in the upper and lower extremities (Tr. 277-78). Plaintiff performed straightway and tandem walks within normal limits and he showed no impairment with Romberg testing and one-foot standing (Tr. 278). Dr. Pinga's impression was MS with pain, numbness, tingling sensation in both hands and both legs, and grand-mal seizure disorder, both being treated with medication (Tr. 278). Dr. Pinga recommended that Plaintiff not drive due to the seizure disorder (Tr. 278, 282). Dr. Pinga also filled out a check box form and opined Plaintiff could occasionally lift and carry up to 20 pounds; sit, walk, and stand for one hour at a time; sit for six hours total in an eight hour work day, stand for five hours total in an eight hour work day, and walk for four hours total in an eight hour work day (Tr. 279-80, 285). Dr. Pinga noted Plaintiff did not require the use of a cane (Tr. 280). Dr. Pinga noted Plaintiff had frequent use of all hand and foot functions and he could

never climb stairs, ramps, ladders or scaffolds, but he could occasionally balance, stoop, kneel, crouch, and crawl (Tr. 280-81). Dr. Pinga opined Plaintiff could never work around moving mechanical parts, operate a motor vehicle, or be near unprotected heights; Plaintiff could occasionally work in humidity or wet conditions, extreme cold/heat, or near vibrations, and Plaintiff could frequently be exposed to dust, odors, fumes, and pulmonary irritants (Tr. 282-83). Dr. Pinga opined Plaintiff could perform basic physical and personal care activities and the restrictions would last for 12 consecutive months (Tr. 283-84).

## III.   ELIGIBILITY AND THE ALJ'S FINDINGS

### A.   Eligibility

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The five-step process provides:

1)  If the claimant is doing substantial gainful activity, the claimant is not disabled.

2)  If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.

3)  If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4)  If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5)  If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**B.    The ALJ's Findings**

At step one of the process, the ALJ found Plaintiff had not engaged in any substantial gainful activity since September 15, 2006, the alleged onset date (Tr. 17).  At step two, the ALJ found Plaintiff had the following "severe impairments": multiple sclerosis; a history of headache; a history of vertigo; a history of a seizure disorder; and a history of right hand fracture (Tr. 17). The ALJ noted these impairments could result in more than minimal limitations in Plaintiff's ability to perform basic work-related activities and were therefore considered to be "severe" (Tr. 17).  At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 17).  Specifically, the ALJ considered Listings 1.00, 11.02, 11.03, and 11.09 (Tr. 17).  The ALJ determined the Plaintiff had the residual functional capacity ("RFC") to perform unskilled sedentary-light work with only occasional postural movements except that Plaintiff could adequately bend and twist, but could not climb; work at exposed heights; work with or in proximity to dangerous machinery/equipment; or drive commercially (Tr. 17).  The ALJ noted in his RFC determination that Plaintiff could lift or carry up to 10 pounds frequently and 20 pounds occasionally, could stand and walk for up to two to four hours and sit for up to six hours in a day, and had adequate abilities in fine and gross manipulation of the upper extremities, seeing, hearing, speaking, maintaining attention and concentration to understand, remember and carry out simple job instructions, interacting with others, using judgment, and adapting to ordinary changes (Tr. 17).  Finally, the ALJ noted that although Plaintiff was somewhat limited by pain and other symptoms, he had an adequate ability to perform activities within a schedule, maintain regular attendance, and be punctual with

customary tolerances (Tr. 17). At step four, the ALJ found that Plaintiff was unable to perform any of his past relevant work (Tr. 32). At step five, the ALJ noted that Plaintiff was a younger individual, 18-49, had a limited education and was able to communicate in English (Tr. 33). After considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform on a regular and continuing basis in open competition (Tr. 33). This finding led to the ALJ's determination that Plaintiff had not been under a disability as of September 15, 2006 (Tr. 35).

## IV.    ANALYSIS

Plaintiff did not file a formal motion or brief in support of his appeal. Instead, Plaintiff's complaint is a letter he wrote, and he also filed letters from family and friends discussing his condition, along with an unsigned (perhaps incomplete) neuropsychological evaluation report dated January 10, 2013 [Docs. 1 & 12]. The Commissioner asserts generally that the ALJ's decision was supported by substantial evidence, and specifically argues in favor of affirming the ALJ's decision and against the Court's review of the extra-record evidence submitted by Plaintiff.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of

the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B. Extra-Record Evidence

The Commissioner argues against the Court's consideration of documents Plaintiff filed with his brief, such as letters from family and friends and the results of a neuropsychological evaluation, because this evidence is not in the administrative record [Doc. 14 at PageID# 60]. The Commissioner further argues the Court is limited to reviewing only the evidence which is contained in the certified record and can only review new evidence to determine if remand is appropriate under sentence six of 42 U.S.C. § 405(g); however, this review requires a specific showing by Plaintiff which has not been made [*id.* at PageID# 60-61]. Specifically, the Commissioner asserts Plaintiff has not shown good cause for not presenting the evidence prior to the ALJ's decision and fails to show this new evidence is material, as there is no showing it would have changed the ALJ's conclusions [*id.* at PageID# 61-62]. As to the neuropsychological evaluation, the Commissioner points out it is not signed, so it is unclear who authored the opinion and whether that individual was an acceptable medical source and, moreover, it concerns a time period starting over a year after the ALJ's decision [*id.* at PageID# 62-63]. The Commissioner further contends the statement therein that Plaintiff cannot return to work is an opinion on an issue reserved to the Commissioner and is not entitled to any weight [*id.* at PageID# 63-64]. Finally, the Commissioner asserts Plaintiff has also not shown how the letters from family and friends would be material [*id.* at PageID# 64-65].

Evidence submitted to the court after the close of administrative proceedings cannot be considered for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Similarly, where the claimant presents new evidence to the Appeals Council, but the Appeals Council declines to review the ALJ's decision, that new evidence may not be considered during review on the merits. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). Instead, the

new evidence can be considered only for purposes of remand pursuant to sentence six of 42 U.S.C. § 405(g), which authorizes the court to remand a case for further administrative proceedings "if the claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). "New evidence is cumulative and not sufficient to warrant remand if it relates to an issue already fully considered by the Commissioner . . . [a]dditionally, evidence that a Plaintiff's health has deteriorated since the Commissioner's decision is not material to that application, and the appropriate remedy is to file a new application." *Farler v. Astrue*, No. 1:10-cv-657, 2011 WL 3715047, at *6 (S.D. Ohio July 29, 2011) (citations omitted). The evidence is material "only if there is a 'reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)); *see also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) ("Material evidence is evidence that would likely change the Commissioner's decision").

The law is clear that this evidence cannot be considered for the purposes of substantial evidence review and cannot be considered in my review of the ALJ's decision. I further **FIND**, however, that Plaintiff has not shown his claim should be remanded pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of this evidence. First, although I **FIND** the evidence is new in the sense that the neuropsychological evaluation is dated January 2013 and some of the letters are dated between October and December 2012, all long after the ALJ's decision, I **FIND** Plaintiff has not established good cause for the failure to obtain this evidence prior to the ALJ's decision. While the Plaintiff is *pro se* in this Court, he was represented by experienced social security counsel during the administrative proceedings. At the hearing prior to the ALJ's

decision, the ALJ noted that a psychological examination had been scheduled for Plaintiff, but he did not show up for the evaluation (Tr. 43). Thus, Plaintiff could have attended an examination scheduled for him by the Agency and had that evidence in the record at the time of his hearing and decision, but he did not; therefore, there is no good cause for his failure to have the report of such an examination in the record. Additionally, if Plaintiff desired letters from his friends and family to be before the ALJ, there is no reason he could not have provided such letters to the ALJ before the decision, as the letters document no new medical evidence and instead primarily recount Plaintiff's childhood, his difficulty obtaining jobs and health insurance, and two seizures, at least one of which is already well documented in the record.

There has also been no showing by Plaintiff that this evidence is material. As noted above, the letters offer nothing in the way of medical evidence substantiating Plaintiff's condition and instead document Plaintiff's childhood, his struggles with taking care of his mother who also had MS, and his difficulties in finding employment and getting health insurance to treat his MS. Although a couple of the letters include eyewitness accounts of two seizures, all of the letters essentially offer lay opinions as to the severity of Plaintiff's condition, which are not entitled to much, if any, weight.

As for the neuropsychological evaluation, it is unclear whether the Court has every page of the unsigned report, which creates an issue with respect to the completeness of the opinion and the author, but in any event, the evaluation itself took place on November 20, 2012; January 4, 2013; and January 9, 2013 [Doc. 12 at PageID# 33-35]. The ALJ's decision is dated April 26, 2011 (Tr. 11-35). Therefore, this evaluation concerns Plaintiff's condition over a year and a half after the ALJ rendered his decision. To the extent this evaluation indicates Plaintiff's condition has become more severe in the interim, "evidence that a Plaintiff's health has deteriorated since

the Commissioner's decision is not material to that application, and the appropriate remedy is to file a new application." *Farler*, 2011 WL 3715047, at *6. Accordingly, I **FIND** the evidence is not material to the issues before the Court at this time, and I **CONCLUDE** there is no basis to remand Plaintiff's claim pursuant to sentence six of 42 U.S.C. § 405(g).

C.     **The ALJ's Decision**

Plaintiff's letter provides an overview of his work history and documents problems obtaining medical treatment due to lack of health insurance [Doc. 1 at PageID# 1]. Plaintiff argues there was a conflict of interest in that his first neurologist also did an examination of Plaintiff for the Social Security Administration, ignored serious and complex issues he was having, and did not order appropriate tests [*id.*]. Plaintiff further alleges the diagnoses of MS and epilepsy have disabled him for life because of burning pains and stiffness in his legs from standing or walking, numbness and tingling in his hands, vertigo, debilitating migraine headaches, memory loss, and severe fatigue and muscle weakness [*id.*]. Plaintiff also described problems with epilepsy and stated the side effects from medication make him sleepy, so he cannot drive or be around machinery, heights or hazardous chemicals [*id.* at PageID# 2].

The Commissioner argues that substantial evidence supports the ALJ's decision that Plaintiff was not disabled because the evidence does not indicate Plaintiff's MS caused limitations beyond those outlined in the ALJ's RFC determination [Doc. 14 at PageID# 52]. The Commissioner asserts the ALJ noted that Plaintiff did not have prolonged episodes of MS symptoms or activity restrictions, and Plaintiff's treating physicians noted his MS was "stable" or "in remission" or was well-controlled on medication [*id.*]. Moreover, the Commissioner notes that although Plaintiff complained of weakness and fatigue, he had full motor function, normal muscle strength and a normal gait, and during examination Plaintiff reported only mild fatigue at

the end of the day [*id.*].  The Commissioner argues the evidence does not support mental impairments caused by MS beyond the restrictions in the ALJ's RFC [*id.* at PageID# 53].  The Commissioner further asserts Plaintiff's seizure disorder did not cause more limitations than those found by the ALJ, as Plaintiff had only experienced a few seizures and his medication controlled seizure activity when it was taken regularly [*id.* at PageID# 54].  As for Plaintiff's vertigo and headaches, the Commissioner observes the ALJ noted the vertigo did not require ongoing medical attention, and when Plaintiff's headaches were their worst, he used over-the-counter medications to treat them and was noted to be functioning well [*id.* at PageID# 55].  Nonetheless, the Commissioner contends the ALJ accommodated any limitations attributable to these issues by limiting Plaintiff to no climbing, exposed heights, exposure to dangerous machinery, or commercial driving [*id.*].

The Commissioner further argues the ALJ properly relied upon the opinions of Plaintiff's treating and examining physicians in crafting Plaintiff's RFC; specifically, the ALJ incorporated much of the opinions of Dr. Mance and Dr. Pinga, which were similar in many areas [*id.* at PageID# 56-57].  Although Plaintiff argued in his letter that the ALJ's reliance on Dr. Mance's opinion was improper because there was a conflict of interest, the Commissioner asserts Dr. Mance was not employed by the Social Security Administration and was instead likely asked to perform an evaluation because he was listed as Plaintiff's treating physician [*id.* at PageID# 57].  The Commissioner notes that while Dr. Mance did not order a neuropsychological test, one was ordered by the ALJ, but Plaintiff did not attend [*id.* at PageID# 58].  The Commissioner argues the ALJ asked the VE a proper hypothetical question that included all the limitations in the ALJ's RFC finding, and the ALJ further asked the VE to confirm that the hypothetical question encompassed the restrictions in Dr. Pinga's opinion [*id.* at PageID# 59].  As such, the ALJ could

properly rely on the VE's testimony to find Plaintiff could perform other jobs and was not disabled, and substantial evidence supports his decision as a whole [*id.* at PageID# 59-60].

As an initial matter, I **FIND** the ALJ reasonably determined the evidence in the record was inconsistent with Plaintiff's hearing testimony and subjective complaints of disabling symptoms. Credibility assessments are properly entrusted to the ALJ, not to the reviewing court, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *See King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984) (noting the rule that an ALJ's credibility assessment is entitled to "great weight," but "declin[ing] to give substantial deference to the ALJ's unexplained credibility finding," and holding it was error to reject uncontradicted medical evidence). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (ALJ was entitled to "rely on her own reasonable assessment of the record over the claimant's personal testimony"); *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994) (ALJ's credibility assessment is entitled to substantial deference). The ALJ explained that no treating or examining physician had documented evidence substantiating Plaintiff's complaints, and he discussed the medical evidence at length, extensively addressing Listing 11.09 for MS, 1.00 for musculoskeletal abnormalities, and 11.02 and 11.03 for seizure disorder (Tr. 19-28). The ALJ's decision is replete with examples of the medical records which establish Plaintiff's MS was stable and generally controlled, his seizure disorder was stable when he was compliant with medication, and Plaintiff often told doctors he had no complaints besides occasional mild fatigue or mild numbness in his extremities. There is no need to repeat such examples here; however, after

carefully reviewing the ALJ's decision, I **FIND** the ALJ's determination that Plaintiff's subjective complaints were not entirely credible was supported by substantial evidence.

Plaintiff takes issue with the ALJ's reliance on the opinion by Dr. Mance because he claims there is a conflict of interest in that Dr. Mance was working for the Agency at the time of the evaluation, but had previously ignored Plaintiff's complaints when he was Plaintiff's treating neurologist. The Commissioner asserts Dr. Mance was not employed by the Agency and Plaintiff was likely referred to him for an evaluation because he had previously been treated by Dr. Mance. The ALJ afforded "considerable weight" to Dr. Mance's opinion, except he gave no weight to Dr. Mance's opinion that Plaintiff had cognitive deficits and the portion of his opinion indicating Plaintiff could never balance (Tr. 31-32). I **FIND** the ALJ reasonably determined Dr. Mance's opinion was entitled to considerable weight, as this opinion was generally consistent with the medical evidence in the record, including the opinion of examining physician Dr. Pinga, and there is no indication Dr. Mance's opinion was adversely affected by his previous treatment of Plaintiff, whether Plaintiff believes this treatment was deficient or not. Moreover, I **FIND** the ALJ's determination not to give weight to the portions of Dr. Mance's opinion indicating that Plaintiff could not balance and had cognitive deficits is not error, as the ALJ explained this decision in great detail with attention to the other records relevant to these aspects of Plaintiff's condition spanning from 2006 to 2011 (Tr. 26-27). All told, I **FIND** no error in the ALJ's treatment of Dr. Mance's opinion.

I further **FIND** the ALJ did not err in determining Plaintiff had the RFC to perform unskilled sedentary or light work with adequate abilities to perform various job tasks, except Plaintiff could not climb, work at exposed heights or around dangerous machinery, or drive commercially, and could only occasionally perform other postural movements. The medical

evidence and all but one of the opinions in the record provide support for this RFC, with the opinion of Dr. Rizvi as the only exception; however, this opinion appears to have been authored very early into the treatment relationship with Plaintiff and the ALJ reasonably gave it little weight, as it was not supported by the medical evidence (Tr. 30-31). Therefore, the great weight of the evidence supports the ALJ's RFC determination, and the VE was asked a hypothetical question that encompassed the restrictions in the RFC and was consistent with the restrictions in the opinions of Dr. Mance and Dr. Pinga. Thus, I **FIND** the ALJ properly relied upon VE testimony that there were light and sedentary jobs that Plaintiff could perform, even considering the restrictions outlined in the ALJ's RFC.

After reviewing the medical records, the hearing testimony, and the ALJ's decision, and in the absence of any further specific arguments provided by Plaintiff, I **CONCLUDE** the ALJ's RFC and credibility determinations are supported by substantial evidence. I **FIND** the ALJ reasonably relied upon VE testimony to find that jobs existed in significant numbers in the national economy which Plaintiff could perform, and I further **CONCLUDE** the ALJ's decision that Plaintiff was not disabled is supported by substantial evidence.

**V.     CONCLUSION**

Having carefully reviewed the administrative record and the Commissioner's arguments,

I **RECOMMEND**[1] that:

    1)  The Commissioner's motion for summary judgment [Doc. 13] be **GRANTED.**

    2)  The Commissioner's decision denying benefits be **AFFIRMED.**

s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[1]  Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order.  *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).